**STATE, Appellee, v. WEIL et, Appellants.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 21501. Decided January 1950.

Frank T. Cullitan, Pros. Atty., Gertrude M. Bauer, Asst. Pros. Atty., Cleveland, for appellee.

A. L. Kearns, A. L. Adelstein, Cleveland, for appellant, Theodore E. Weil.

M. A. Picciano, Cleveland, for appellant Thomas L. Murray.

(GUERNSEY, PJ, and MIDDLETON, J, of the Third District, and DOYLE, J, of the Ninth District, sitting by designation in the Eighth District.)

## OPINION

By DOYLE, J.

Theodore E. Weil, Thomas L. Murray and Forrest Gale Johnson were named in an indictment charging them with

kidnapping and raping Rosaleen O'Donnell, a twenty-four-year-old Cleveland woman. Pursuant to a joint trial by jury, Weil and Murray were found guilty on the count of rape, and Johnson was found to be not guilty. All were acquitted on the count of kidnapping.

Weil and Murray are now before this court on appeal on questions of law from the judgment of conviction of rape entered upon the verdict of the jury in the Court of Common Pleas of Cuyahoga County.

There are six assignments of error urged as grounds for reversal of the judgment. They are in brief:

1. The overruling of motions for separate trials.

2. The refusal of the trial court to allow in evidence the original affidavit filed in the Justice of the Peace Court upon which was based the commitment of the accused to the grand jury.

3. The introduction into the evidence of hospital records "containing the statements made by the prosecuting witness in the absence of the appellants, not part of the res gestae, as to the cause of her alleged injuries."

4. The court's charge to the jury that the "statements or confessions of one codefendant (Johnson) could be used against the others in the event they found there was a conspiracy."

5. Misconduct of the bailiff of the court in communicating with the jury during its deliberations.

6. The refusal of the court, upon request of the jury, to read to it certain testimony given during the trial.

As we examine the record before us, we find that the circumstances which were established by evidence entirely competent, were so conclusive of the guilt of the appellants that no honest jury could have refused to convict them of the crime of rape.

However, finding as we do that no reasonable person could come to any other conclusion than that the appellants are guilty of rape, we are called upon to examine various errors which occurred during the trial, and to determine whether a new trial must be granted because of them. (The appellants make no complaint as to the weight of the evidence.)

We first start with the principles that these defendants are entitled to a fair trial before a jury; that they shall not be deprived of life, liberty or property without due process of law, nor denied the equal protection of the laws. The observance of these rights are ends in themselves, not merely means to an end, because they are guaranteed by the constitution and by a common sense of justice inherent in our American way of life.

It is quite another thing, however, to think of rules of evidence, rules for the conduct of trials in a court of justice, and rules of strict trial procedure, as ends in and of themselves, for these rules are but the instruments employed for an investigation of the true facts, and for the orderly and fair presentation of the evidence to a disciplined jury, to the end that it may without improper influence arrive at the ultimate facts.

Throughout the years, students of jurisprudence in this country and abroad have argued whether the strict rules of evidence and trial procedure, or conduct of the jury or conduct of the attaches of a court, must be considered as ends in and of themselves, so independent of justice and so superior to truth, that such ends must be attained even at the cost of truth and justice, or whether they may be considered the means to an end—the end being a just determination of a particular controversy before a court of justice.

In respect to the admission or nonadmission of evidence, Professor Wigmore, in brief, observes that, under the old Orthodox English rule, an erroneous admission or rejection of a piece of evidence was not a sufficient ground for setting aside a verdict and ordering a new trial, unless, upon all the evidence, it appeared to the judges that the truth had thereby not been reached. Such was the rule in the King's Bench in criminal cases. This lasted to the decade of 1830.

There then came into being a rule which in spirit and in later interpretation signified that an error of ruling created per se for the defeated party a right to a new trial. This is commonly known as the "Exchequer rule." It found recognition in the United States, in its most extreme form, in a vast number of decisions. There were, however, some courts in this country which refused to adopt the change. They rule that, although the reception of illegal evidence, or the refusal to admit proper evidence, is presumptively injurious to the accused, when that presumption is repelled, and it clearly appears from the whole record, beyond the possibility of rational doubt, that the result would have been the same, if the objectionable evidence had been rejected, or the competent evidence admitted, the error of its admission or refusal furnishes no ground for reversal.

In recent years, through the influence of a disgusted public, which had seen time and time again the scales of justice heavily weighted in the interest of the criminal and untold numbers of guilty persons set free through technicalities and rigid procedure, the American Bar Association and the

legislatures of various states have undertaken the problem of doing away with the pernicious rule of the Exchequer, as well as other rules of strict procedure and conduct, to the end that matters of pure procedure or the admission or nonadmission of evidence should not be given the sanctity of an absolute right precedent to conviction, and should not usurp the administration of justice as if their observance were the ends to be attained.

In line with this thought, the legislature of Ohio has enacted the following statute (**§13449-5 GC**):

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court in case of any inaccuracy or imperfection in the indictment, information or warrant, provided that the charge be sufficient to fairly and reasonably inform the accused of the nature and cause of the accusation against him; nor for any variance between the allegations and the proof thereof unless the accused is misled or prejudiced thereby; nor for the admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby; nor for any misdirection of the jury unless the accused was or may have been prejudiced thereby; nor for any other cause whatsoever unless it shall affirmatively appear from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

This statute pronounces the law of Ohio, and it now becomes the duty of this court to determine its applicability to the facts before us.

1. It is asserted that the court erred in overruling motions for separate trials.

The claim was made, before trial, that one of the defendants, Johnson, had made a written confession in the absence of the others, which implicated them in the charged crime.

Under **§13442-11 GC**, we encounter the following rule of procedure:

"When two or more persons are jointly indicted for a felony, **except a capital offense,** they shall be tried jointly unless the court for good cause shown on application therefor by the prosecuting attorney or one or more of said defendants, order that one or more of said defendants be tried separately." (Emphasis ours.)

The Supreme Court of this state, in applying the statute to the factual situation existing in the case of **State v. Rosen, et al., 151 Oh St 339,** ruled:

"Where it is disclosed, preceding the trial of codefendants jointly charged with the commission of a felony, that a signed **confession** by one of the defendants, made in the absence of his codefendants, will be put in evidence, **which confession contains statements showing the guilt of a codefendant,** and based thereon an application for separate trial is duly made by that codefendant, it is the duty of the trial court either to grant the application or to order the prejudicial matter withheld or deleted before admitting the confession in evidence." (Emphasis ours.)

This ruling was not intended to change the statute requiring joint trials in all cases except those in which **for good cause** separate trials should be allowed. It is authority for the proposition that, under certain circumstances, a trial court may be guilty of an abuse of discretion prejudicial to the rights of a defendant, if separate trials are not permitted upon application, when it is made known to the court that the prosecution intends to put into evidence a signed confession, made by one, which **contains statements showing the guilt of a codefendant.** The case does not take from the trial court the right to exercise judicial discretion in determining what is "good cause." It undertakes only to say that, under the circumstances therein shown to exist, the failure to find "good cause" and to grant the request for separate trials, constituted an abuse of discretion and was prejudicially erroneous.

The record of events as testified to by the appellants herein (each testified in his own behalf), shows that the prosecuting witness and the three defendants, after a drive over various streets of the city of Cleveland, in an automobile owned and operated by defendant Weil, arrived in the vicinity of the prosecuting witness' home (probably shortly after 4 a. m.); that the driver proceeded on without stopping, and, when they came to an area of scant population, the girl screamed, opened the door of the car and tried to get out. The car was then stopped, she alighted and ran to the rear of the car, from which point she yelled, according to her own testimony: "I have the license number of your car. You'll never get away with what you're trying to do." Weil testified that she screamed: "I've got your license number, you're going to get in trouble." She then commenced to run down the road, screaming continuously, whereupon the defendants Weil and

Murray (each well-built, athletic men over six feet tall), jumped from the car and pursued her on foot. Weil caught and slapped her. She then lunged at him, and Murray, who was following Weil, attempted to get between them for the purpose of separating them. In the ensuing struggle between the girl and the two defendants, they all fell and rolled into a steep-sided ravine about 15 feet deep at the side of the highway. At this time, the other defendant, Johnson, drove the car away.

Up to this point, the testimony of the defendants and the prosecuting witness is substantially the same, except that she testified that she was thrown into the ravine by the three defendants. From here, the testimony diverges. The appellants, Weil and Murray, state that after falling into the ravine, they saw no more of the girl, and they saw no more of each other, reached the highway by separate routes, and left the scene of their experience. The girl testified to a cruel and vicious assault and rape upon her by each of the two appellants; that she was struck by them many times, her clothes were torn from her body, and several different acts of rape were completed by each of them upon her. They then left her lying in the ravine. After somewhat recovering her strength and composure, she climbed the bank of the gully, and was shortly thereafter helped by the driver of a U. S. Mail truck to reach the nearest telephone to notify the police.

The testimony of this federal employee and many others who saw her, showed her to be severely injuried and in great shock. Much of her clothing had been stripped from her body, which was covered in places with blood and wounds. After a short delay in her home (where she was immediately taken), she was taken to Mt. Sinai Hospital, and there examined and treated. Attending doctors testified, and the hospital chart shows, that upon arrival, she suffered from a comminuted fracture of the right clavicle, and multiple hemorrhages, bruises and contusions over her body; her vagina had been stretched and torn, leaving an open wound at the "junction of the skin and the lining" thereof; she suffered from a bite on her right breast; and spermatozoa "were found in large numbers" in the region between the uterus and the external orifice of the genital canal.

An examination of the so-called "confession" of the co-defendant, Johnson, shows it to vary only in inconsequential detail from the testimony of the appellants themselves. His written and signed statement in none of its aspects accuses the appellants of rape. It only attempts to recite the movement and conduct of the three defendants up to the struggle

on the highway, and then to describe, at a later time, his own search for his companions. In this recitation, he tells of finally meeting Murray, and their subsequent arrest by the police. The latter, in most part, is corroborated by the appellant Murray himself.

We do not find an abuse of discretion by the trial court in his refusal to permit separate trials. There are no statements in the so-called "confession" "showing the guilt of a codefendant," and we are entirely satisfied from the record that the jury thoroughly understood from the court's instruction that, whatever Johnson did say, either written or oral, could be used only against him as a defendant, and not against the others.

2. It is claimed by the appellants that the trial court erred to their prejudice in not permitting the introduction in evidence of the affidavit upon which they were bound over to the grand jury, signed by a police officer and filed in the Justice of the Peace Court about noon on the day of the claimed rape.

It appears that the affidavit charges the offense of assault with intent to rape. The appellants argue that "as the statements set forth in that affidavit are materially different from the testimony of the prosecuting witness at the trial of this case, we believe that the trial court should have permitted its introduction to impeach or support the credibility of the prosecuting witness, and the court's ruling in this respect constitutes prejudicial error."

In consideration of this claimed error, the members of this court are of the opinion that a discussion of the rules of evidence pertinent thereto would be a work of supererogation. Under no theory of law was such affidavit competent in the light of the record before us.

3. The third assignment of error is that certain "hospital records containing statements made by the prosecuting witness in the absence of the appellants, not part of the res gestae, as to the cause of her alleged injuries," were erroneously admitted in evidence and were prejudicial to the rights of the appellants.

The exhibit under attack consists of eleven pages of photostatic copy of the records of Mt. Sinai Hospital. It records the observable facts and events incident to the treatment of the patient and was without doubt helpful to an understanding of the medical and surgical aspects of the hospitalization of the patient. Such records are admissible with certain qualifications, in criminal as well as in civil litigation.

Sec. 12102-23 GC.

The facts relating to the prosecuting witness' physical condition, as heretofore stated, are shown in the records. In addition thereto, under headings of "history" and "present illness," there appeared at two different places a notation that she had been criminally assaulted.

The record shows that all of counsel for the defense objected to the admission in evidence of the record for the reason that "there are * * * statements and conclusions made by the person making the record—a conclusion drawn by the lady making the statement herself." Counsel then proceeded to tell the court that "they have no objection to the introduction of the statement relating to the lady's condition and the treatment accorded her."

The court properly sustained the objections, and, in compliance with the ruling, the challenged language appearing in the first part of the record was covered with scotch tape and deleted. It so happened, however, that the same conclusion appeared on one of the subsequent pages and was apparently inadvertently overlooked by counsel and the court. The exhibit went to the jury without its obliteration.

In consideration of this claim of error, we must and do conclude that all objectional material should have been expunged. However, there is some duty resting on a defendant and his counsel. He cannot in every case sit by and permit objectionable material to be given to a jury by inadvertence after a court has ruled in his favor, and then, after losing his case, complain for the first time of error in its reception.

If, however, because of this error, the members of this court were of the opinion that the defendants were denied a fair trial and were prejudiced thereby, a new trial would be granted. But, after a minute examination of all of the evidence, both circumstantial and direct, we have no lingering sense of uncertainty that the evidence was prejudicial, or that without it the jury would have reached a different conclusion. If the members of the jury saw and considered the challenged words, certainly they, as normal persons, understood them to be but the words of some person in the hospital who made up the record, and were not the words of a witness to the alleged offense.

4. Complaint is made that the trial court erred in instructing the jury that if they found a conspiracy to exist, the statements or confession of one defendant could be used against the other.

The trial court charged the jury as follows:

"Various statements have been permitted in evidence, made by one defendant, which included more than himself. These statements were permitted as against themselves, but in the event you find beyond a reasonable doubt that the defendants conspired together, as I have previously charged you, then the evidence may be received, their confessions or whatever they may have said, their own statements, may be recived not only against themselves, but against the others. If you do not find that a conspiracy existed between them, then their admissions or statements or confessions can only be used, and must be limited, as against the one that made the statement or confession."

This charge of the court was error. Even if the court was justified in finding from the evidence and the reasonable inferences to be drawn therefrom that there was presented a disputed question of fact of the existence of a conspiracy to kidnap (there is no evidence to show a conspiracy to rape, and only a bare suspicion of a conspiracy to kidnap), the charge was wrong.

It has long been the rule in this state as well as elsewhere that:

"The acts and declarations of a conspirator may, after sufficient proof of conspiracy, be given in evidence to charge his fellow-conspirator, but subject always to the limitation that the acts and declarations admitted be those only which were made and done during the pendency of the criminal enterprise, and in furtherance of the common object.

"Where the declarations are merely a narrative of a past occurrence, they can not be received as evidence of such occurrence. They must be concomitant with the principal act, and connected with it, so as to constitute a part of the res gestae." **Patton v. State, 6 Oh St 468.**

And see: **8 O. Jur., Conspiracy, Sec. 19, p 61.**

Finding error as we do in the respect claimed, the question arises, Is it of a prejudicial character in view of the record?

None of the statements or declarations of the defendants were confessions of guilt in any sense of the word, for a confession, in the ordinary sense of the word, is an acknowledgment in words by an accused person of the truth of the

guilty fact charged or of some essential part of it. At no time did any defendant admit the crime of rape or kidnapping, or accuse any of the codefendants with any criminal conduct within the scope of the indictment. And, as heretofore stated, the testimony given and statements made by all of the defendants varied only in inconsequential detail.

We do not believe that the jury was misled by this charge, nor do we believe that the appellants were prejudiced thereby. We are of the opinion that this error falls strictly within the language of §13449-5 GC, supra. To hold that this jury was influenced by this charge to render a verdict not warranted by the overwhelming evidence of actual rape, would be an unjust imputation on the whole jury system.

5. The fifth assignment of error charges "Misconduct of the trial court's bailiff in communicating with the jury during its deliberations," thereby depriving the appellants of a "fair and impartial trial as guaranteed them under the constitution."

The sordid detailed account of the prosecuting witness, in which she related the conduct of the appellants while alternately raping her, is in the record. At one point in her testimony there appears the following:

"He (Weil) was on top of me * * *. He was bitting me on my right breast, right here (indicating). It felt as if he had a piece of my flesh in his mouth. Murray said 'let's get out.' Weil says 'I'll be with you in a minute. This kid is practically out.' "

The testimony of the doctors who saw her subsequently on the same day, indicated teeth marks on her right breast, and the hospital records so show.

It appears that, during the course of the jury's deliberation, the bailiff of the court was summoned by the jury. Upon his response to the summons, he was asked which of the appellants had bitten the prosecuting witness. He said that he would find out. He then proceeded to the trial judge, and, without telling him the reason for the question, asked him the same question that the jury had asked of him. The trial judge told the bailiff that the testimony indicated Murray. The bailiff then, without the knowledge of the judge, or any of counsel, returned to the jury room and told them that it was Murray.

As the bailiff was returning from the jury room, the lawyer for Murray asked him "what had happened." The bailiff

told him. The lawyer then informed the bailiff that the information given was contrary to the evidence because the girl had testified it was Weil. The bailiff then went into the chambers of the trial judge and said, "it is the jury that wants to know; they are discussing this matter and want to know who it was, Murray or Weil, that bit the girl." The court then said: "No communications may be made with the jury, no communications whatsoever."

The court bailiff then left and the judge called the lawyers for the defendants into conference. In the meantime, however, the court bailiff, unbeknown to the court or counsel, again went to the jury room and said to the foreman "to disregard what * * * (he) had told him, it was not Murray who had bit the plaintiff, that they would be summoned before the court * * *." The bailiff then left.

Later, when all counsel for the State and the defendants arrived at the court room, the jury was called to the court room, and the record speaks as follows:

"The Court: Ladies and gentlemen of the jury, I have been told you have a question you wish to present to the Court; is that correct?

"The Foreman: Yes, sir.

"The Court: Will the foreman present the question? * * *

"The Foreman: Will you have the stenographer read the girl's testimony?

"The Court: The girl's testimony as to what?

"The Foreman: At the point where they fell into the gully."

At this point, counsel for Weil and Johnson stated that they had no objection. The court then called all of counsel into his chambers and there a discussion took place, in which counsel for the defendant Murray objected to the reading of the testimony of the girl "on the ground that it would be over-emphasizing a portion of the testimony." All then proceeded to the court room, and the record shows the following in the presence of the jury:

"The Court: I find that while there is no objection on the part of any of the defendants, nor on the part of the State, we cannot, in a criminal case, have the testimony re-read, as that might emphasize one phase of the case."

(Although there seems to be an inconsistency between this statement by the Court and the previous recitation of the

happening in the chambers of the Court, apparently the Judge attempted to save counsel for Murray from any possible prejudice or embarrassment by reason of his objection to the reading of any of the testimony.)

"The Foreman: That won't be necessary. The thing is now, on behalf of Johnson, we have another question to ask. I don't know how to ask it.

"The Court: As to Johnson?

"The Foreman: Yes, as to Johnson.

"The Court: State your question, and if I can be of any assistance under the law * * *.

"The Foreman (after consulting with some of the jurors): We will go back to the room, and come down very shortly.

"The Court: Give the matter full and fair consideration, and return with your verdict into this court. Do not be in haste, but do it as expeditiously as possible."

During all of this time, the court was apparently unaware of the communication of the bailiff with the foreman of the jury. Counsel for Murray, however, knew of it but made no disclosure of the fact to the Court until he later moved for a new trial, subsequent to the verdict of the jury. In fact, this counsel said to the bailiff, after he was told of the incident: "John, I think the guardian angel must be hovering over my client. I have grounds for a new trial." It appears also that one of the counsel for Weil was in direct association with the bailiff as well as with the counsel for Murray during this time. It does not directly appear, however, that he knew of the bailiff's conduct. What the actual fact is, the record does not show.

At any rate, no one asked the Court for a mistrial because of it, nor was this misconduct urged as a ground for a new trial on behalf of Weil, although, certainly, after the jury's verdict, the misconduct was known to counsel for Weil as well as to counsel for Murray.

The behavior of the bailiff was reprehensible, and no excuse can be given for such a stupid act.

The failure of counsel for the defendant Murray to tell the court immediately of the bailiff's action was a gross violation of his duty as an officer of the court before which he was then practicing. The fact remains that he did not ask for a mistrial because of the misconduct, and was content to waive it at least temporarily.

It is, indeed, the law of this state that the legal rights of every individual must be recognized and protected. Among

these rights is the inherent privilege of one accused of the commission of a felony to be present in person at every stage of his actual trial. **Sec. 10, Article I, of the Ohio Constitution,** as well as §13442-10 GC, makes such provision.

**State v. Grisafulli, 135 Oh St 87.**

It is likewise the law that "The violation by a court officer in charge of a jury of §13448-1 GC, to the effect that he shall not communicate with a jury in his charge or custody except to inquire whether it has reached a verdict, will be presumed to be prejudicial to a defendant against whom, after such communication, a verdict is returned by such jury."

**State v. Adams, 141 Oh St 423, syllabus 3.**

In State v. Adams, supra, it appears that the bailiff, when advised by the jury that they were unable to reach a decision, replied "you can't do that. You must reach a decision if you have to stay here for three months." One of the jurors later testified that she changed her vote to "guilty," "which she would not have done except that she understood the jury must reach a decision." It also appears that factually it was a close case. It had been tried once before and the jury had disagreed and was then discharged. There seems to be no question but that the bailiff's act was highly prejudicial, and, because of it a verdict was returned which otherwise would probably not have been rendered.

In the light of this decision (so strongly relied upon by the appellants), how stands the case now under consideration? First, we must determine and do say that the conduct of the bailiff was ·presumptively prejudicial to the rights of the appellants. Must we stop here of may we, as judges (as contrasted to umpires), deal with this concept as a provisional hypothesis, to be reformulated and restrained, if it, when developed with a disregard of consequences, would bring into being an injustice? Must we say that a violation of the statute by a bailiff is per se prejudicial error? Or is it better wisdom in the administration of justice to look to the record and determine whether the presumption of prejudice has been overcome, and, if so, treat it as harmless error?

It is our thought that the just rule should be that even though a violation of the statute creates a presumption of prejudice, such presumption **may be** overcome by the evidence and the attendant facts and circumstances. If it is overcome, then a new trial is not required on that ground; if it is not, a new trial is, of course, mandatory.

"It is a peculiar virtue of our system of law that the process of inclusion and exclusion, so often employed in developing

a rule, is not allowed to end with its enunciation and that an expression in an opinion yields later to the impact of facts unforeseen." Brandeis, J., in Jaybird Mining Co. v. Weir, etc., 271 U. S. 609, at p. 619, 70 L. Ed. 1112, 1117.

"There is nothing new in this notion of the subordination of legal concepts to expediency and justice, though as with many an old truth there is need to restate it now and again."

Cardozo, The Paradoxes of Legal Science, p. 64.

Now, what are the facts before us which we must appraise in view of the presumed prejudice?

**First**, the bailiff told the jury that the testimony showed that Murray bit the girl, when, in fact, the finger had been pointed at Weil. This did not prejudice Weil.

**Second**, the bailiff later told the jury that it was not Murray who bit the girl, and that they should disregard what he had told them before. This certainly did not injure Murray. In fact, it left the jury just where they had been before the bailiff's transgressions.

But, over and beyond this, the facts which no reasonable mind could fail to find, are that the girl, in physical vigor and well and neatly dressed, rode our in the night with the three defendants; that, after a struggle with the two appellants, Weil and Murray, on the public highway, they all were precipitated into a ravine by the road; that, after falling into the ravine, the girl's clothing was stripped from her body, her face and trunk revealed marks of a beating, her breast was bitten, and her private parts were torn, stretched and lacerated, and saturated with animal sperm. All of these facts were established by unimpeachable evidence from persons who told of their actual observations. This evidence alone establishes, beyond peradventure, a rape upon her by some one.

This evidence, the testimony of the injured girl, and the overwhelming force of the rational inferences of impious irreverence of the appellants for the sanctity of an oath and the truth, coupled with the retraction by the bailiff of his statement to the jury, overcame, in the opinion of the members of this court, the presumption of prejudice which attached when the statute was violated. The rule of prejudice must be tested by a sensible appraisal of the totality of facts in a given case.

The claim is further made that the appellants were deprived of their constitutional rights.

In this connection, it may be said succintly that facts and circumstances which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of a denial of constitutional guarantees. It is not the province of courts to formulate constitutional guarantees into a set of hard and fast rules, ignoring entirely all qualifying factors. Mere irregularities or informalities which would subject jurors or court officers. to censure, do not in all instances indicate a violation of constitutional guarantees and a denial of a defendant's right to be present at all of the stages of his trial. The facts here before us indeed indicate irregularities. The misconduct occurred in the presence of the jury. But, certainly, such misconduct was not a part of the "trial." The word "trial" as used in the constitution, has an entirely different connotation.

6. The last assignment of error refers to the refusal of the court to read to the jury certain testimony requested by them during their deliberations.

**Sec. 11420-6 GC,** provides:

"After the jurors retire to deliberate, if they disagree as to the testimony, or desire to be further informed on the law of the case, they may request the officer in charge to conduct them to the court, which shall give them the information sought upon matters of law, and also, in the presence of or after notice to the parties or their counsel, may state its recollection of the testimony upon a disputed point."

This statute permits a court to "state its recollection of the testimony upon a disputed point" if requested by the jury. The jury requested that the **record be read.** There is no statutory requirement that testimony be read to a jury. Nor is it a mandatory requirement that the trial judge state his recollection of the testimony.

In the light of the record before us, we do not find, by the court's refusal to read a part of the testimony, an abuse of discretion.

For the reasons stated, the judgment will be affirmed.
Judgment affirmed.

GUERNSEY, PJ, and MIDDLETON, J, concur.